# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

HERCHELLA A. SMITH,         )
                                   )
      Plaintiff,           )
                                   )
      v.                    )       Case No. 3:07-cv-443-MJR
                                   )
MICHAEL J. ASTRUE, Commissioner of   )
Social Security, et al.,          )
                                   )
      Defendants.       )

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge Michael J. Reagan pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1 (a) for a Report and Recommendation. Plaintiff Herchella A. Smith seeks judicial review of the final decision of the Commission of Social Security denying her claim for Supplemental Security Income. Plaintiff's application was denied by the Administrative Law Judge ("the ALJ") when he rendered a decision finding that Plaintiff was not disabled (Tr. 12-19). That decision became final when the Appeals Council declined to review the ALJ's findings (Tr. 3). Judicial Review of the Commissioner's final decisions is authorized by 42 U.S.C. § 405(g).

For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's petition be **GRANTED**, that the case be **REMANDED** to the Social Security Administration for further proceedings consistent with this Report and Recommendation, and that the Court adopt the following findings of fact and conclusions of law:

# I.    FINDINGS OF FACT

## A.    Procedural History

Plaintiff, Herchella A. Smith (the "Plaintiff"), filed for Supplemental Security Income ("SSI") on June 9, 2004, alleging that she was unable to work due to a history of seizures and fibromyalgia[1] (Tr. 38).  Her claim was denied both initially in October 2004, and upon reconsideration in February 2005 (Tr. 12).  Plaintiff requested, and was granted, a hearing before an administrative law judge; the hearing took place in December 2006.  In January 2007, the ALJ issued a decision denying benefits, finding that Plaintiff was not disabled (Tr. 12-19).  In late April 2007, the Appeals Counsel denied Plaintiff's request for review (Tr. 3-5).  After this final decision, Plaintiff filed her complaint with this Court on June 27, 2007 (Doc. 2).

## B.    Substantive History

Plaintiff was forty-one years old with a ninth-grade education at the time of the ALJ's decision (Tr. 35, 42).  Plaintiff has not engaged in any substantial gainful activity or relevant work under the appropriate regulations (Tr. 17).  Plaintiff's medical history, as it relates to her disability claim, dates back to the early 1990s.

In November 1992, Plaintiff was admitted to Wabash General Hospital and diagnosed with seizure activity, migraine headaches and fibrocystic disease of the breasts (Tr. 177-78).  After her release she was prescribed Dilantin,[2] Xanax,[3] Tylenol with codeine #3 and Amitriptyline;[4] she was also instructed to meet with a mental health counselor (Tr. 178).

---

[1] Fibromyalgia is a disorder of unknown cause characterized by chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles.  Stedman's Medical Dictionary 725 (28th ed. 2006).
[2] Dilantin is an antiepileptic drug prescribed to control grand mal seizures (in which the individual experiences sudden loss of consciousness followed immediately by generalized convulsions) and temporal lobe seizures, which are caused by disease in the cortex of the

On November 10, 1993, Plaintiff saw Dr. William Rosenfeld at St. Luke's Hospital for treatment of her seizure condition following a referral by her neurologist, Dr. David E. Hill (Tr. 179). Dr. Rosenfeld observed several episodes of general jerking of the body without electrographic correlates, suggesting that the seizures were absence seizures[5] with nonepileptic episodes (Tr. 179, 181). Dr. Rosenfeld recommended that Plaintiff continue counseling and urged her to follow up with both himself and Dr. Hill, but he did not prescribe antiepileptic medications pending an MRI[6] scan of the brain (Tr. 182). Dr. Rosenfeld's Discharge Summary Addendum of December 18, 1993, confirms he performed a personality assessment that he interpreted as consistent with somatization[7] disorder, anxiety disorder, and/or depressive disorder (Tr. 183).

About a year later, on November 16, 1994, Dr. Hill again saw Plaintiff, this time noting both a seizure history dating back to November 1992, and a history of depressive condition which Plaintiff indicated was no longer a problem (Tr. 188). After reviewing an abnormal twenty-four hour ambulatory EEG[8] with some evidence of generalized seizure activity, Dr. Hill

---

temporal lobe of the brain. Physician's Desk Reference Consumer Drug Information Database, Dilantin, http://www.drugs.com/pdr/dilantin.html (last visited July 28, 2008).

[3] Xanax is a benzodiazepine which affects chemicals in the brain that may become unbalanced and cause anxiety. Physician's Desk Reference Consumer Drug Information Database, Xanax, http://www.drugs.com/pdr/xanax.html (last visited July 28, 2008).

[4] Amitriptyline (or amittriptyline hydrocholoride) is a tricyclic antidepressant used to treat sleep disorders and neurogenic pain syndromes. Stedman's Medical Dictionary 63 (28th ed. 2006).

[5] Absence seizures are characterized by impaired awareness of interaction with, or memory of, ongoing events external or internal to the person. Stedman's Medical Dictionary 1743 (28th ed. 2006)

[6] Magnetic resonance imaging (MRI) is a nonionizing (non x-ray) technique using magnetic fields and radio frequency waves to visualize anatomic structures. Stedman's Medical Dictionary B13 (28th ed. 2006).

[7] Somatization is the process by which psychological needs are expressed in physical symptoms. Stedman's Medical Dictionary 1788 (28th ed. 2006).

[8] An electroencephalogram, or EEG, records the electric potentials of the brain derived from electrodes attached to the scalp. Stedman's Medical Dictionary 613, 621 (28th ed. 2006).

recommended discontinuation of Dilantin and Inderal[9] in favor of Depakote[10] and Inderal LA[11] and recommended Plaintiff keep a headache journal (Tr. 190).

Plaintiff was next seen by Dr. Hill on January 9, 1995, with a follow up on February 19, 1996, after missing several scheduled follow-up appointments (Tr. 186). Plaintiff failed to keep a seizure calendar as recommended at the January 1995 appointment and came in primarily to renew her medications and to discuss her son's possible seizure condition (Tr. 186). Dr. Hill diagnosed her as having generalized seizure disorder with equivocal control, mixed tension vascular headaches with questionable control, and anxiety disorder (Tr. 187). As a result, he increased her Depakote dose, renewed her Inderal LA and Pamelor,[12] and again requested that a seizure calendar be kept (Tr. 187).

Plaintiff returned to see Dr. Hill on April 16, 1997, after again missing several scheduled follow-up appointments (Tr. 184). She complained of seizures and persistent back pain, as well as headaches which were controlled, but persistent (Tr. 184). Her Depakote and Pamelor prescriptions were renewed, she was prescribed Neurontin[13] to control her persistent nocturnal

---

[9] Inderal is a beta blocker used in the treatment of high blood pressure, chest pain, changes in heart rhythm, migraine headaches, hereditary tremors, hypertrophic subaortic stenosis, and tumors of the adrenal gland. Physician's Desk Reference Consumer Drug Information Database, Inderal, http://www.drugs.com/pdr/inderal.html (last visited July 28, 2008).

[10] Depakote is most commonly used to treat certain kinds of seizures and convulsions. Physician's Desk Reference Consumer Drug Information Database, Depakote, http://www.drugs.com/pdr/depakote.html (last visited July 28, 2008).

[11] Inderal LA is the long-acting or sustained release version of Inderal. Physician's Desk Reference Consumer Drug Information Database, Inderal LA, http://www.drugs.com/pdr/inderal-la.html (last visited July 28, 2008).

[12] Pamelor is a tricyclic antidepressant primarily prescribed for relief of the symptoms of depression. Physician's Desk Reference Consumer Drug Information Database, Pamelor, http://www.drugs.com/pdr/pamelor.html (last visited July 28, 2008).

[13] Neurontin is prescribed with other medications to treat partial seizures, where the symptoms are limited. Physician's Desk Reference Consumer Drug Information Database, Neurontin, http://www.drugs.com/pdr/neurontin.html (last visited July 28, 2008).

seizures, and she was given a hand-out on back exercises that could be followed to help alleviate her back pain (Tr. 185).

Plaintiff was seen several times between from 1999 to 2004 at the Wabash County Medical Center and Wabash County Rural Health Clinic, primarily under the care of Dr. Lawrence P. Jennings (Tr. 200-15). Plaintiff initially complained of continued seizure activity, often with a preceding aura which would warn her that a seizure was coming, and said she had sometimes experienced back-to-back seizures (Tr. 214). On January 19, 1999, Dr. Jennings noted the existence of grand mal seizures and that, while their control was questionable, they did not seem to be worse since she was off her medications (Tr. 214). Dr. Jennings recommended Topamax[14] and Depakote (Tr. 215).

During a December 8, 1999, appointment, Dr. Jennings determined that Plaintiff's seizure disorder appeared to be stable (Tr. 213). On March 1, 2000, he indicated that the episodes complained of by the Plaintiff appeared to be a seizure disorder that medications appeared unable to control (Tr. 211). Dr. Jennings expressed doubt that any amount of medication would ever be able to completely control the episodes (Tr. 211). Subsequent visits failed to show any EEG, MRI, or CT[15] scan indications of seizure activity, but again noted that medications did not seem to alleviate Plaintiff's episodes (Tr. 200-11).

In 2004, Plaintiff began seeing Dr. Grace Fowler at Wabash General Hospital (Tr. 173-76). Plaintiff's complaints initially related to chest pains and intestinal discomfort, but no significant diagnoses were issued (Tr. 146-76). On October 1, 2004, Plaintiff complained to Dr.

---

[14] Topamax is an antiepileptic drug prescribed to control both partial seizures and grand mal seizures or for the prevention of migraine headaches. Physician's Desk Reference Consumer Drug Information Database, Topamax, http://www.drugs.com/pdr/topamax.html (last visited July 28, 2008).

Fowler of stress and depression (Tr. 145). Dr. Fowler diagnosed Plaintiff as having an acute episode of depression, anxiety, and fibromyalgia and responded by increasing her medications (Tr. 145). Later that month, Plaintiff returned after falling in a store, claiming that her medications were not working (Tr. 141). Dr. Fowler suspected that some of her dizziness may have been malingering (Tr. 141). Plaintiff also participated in a sleep study in October 2004, which diagnosed mild obstructive sleep apnea[16] syndrome and recommended that she sleep at a lateral position and consider an ENT[17] evaluation because of her high snoring index (Tr. 99-101).

On October 1, 2004, a Physical Residual Functional Capacity ("RFC") Assessment was completed by Dr. Julio M. Pardo at the direction of the State Agency due to Plaintiff's disability claim (Tr. 90-97). Dr. Pardo concluded that the Plaintiff had a "history of seizures, which appears to be well-controlled" and that she should "avoid hazardous machinery and heights due to seizure history" (Tr. 97).

On November 2, 2004, Dr. Hyun Kimm evaluated Plaintiff for possible surgery to relieve right upper quadrant abdominal pain (Tr. 127). Dr. Kim determined that Plaintiff was not a surgical candidate because of her recent diagnosis of seizure disorder (Tr. 129). Later that month, Plaintiff visited the Wabash General Hospital emergency room due to seizure activity, and was discharged later that day in an improved, stable condition (Tr. 104-05). By December of 2004, Dr. Fowler noted that Plaintiff was sleeping better and had a more stable mood, but that her complaints of pain appeared to have no physical cause and, therefore, Dr. Fowler recommended treatment through counseling instead of medication (Tr. 136-37).

---

[15] A CT, or computed tomography, scan synthesizes x-ray transmission data to map anatomic information from a cross-sectional plane of the body. Stedman's Medical Dictionary 468, 1996 (28th ed. 2006).
[16] Sleep apnea is central and/or peripheral absence of breathing during sleep, associated with frequent awakening and often with daytime sleepiness. Stedman's Medical Dictionary 118-19 (28th ed. 2006).

In January 2005, Plaintiff began seeing Dr. Eduardo Pineda and Dr. Sandy Horton at the Wabash County Health Department (Tr. 224-43). Plaintiff complained of anxiety, fearfulness, agoraphobia, sensory hallucinations, insomnia, and impulse control, including grand mal and petit mal seizures that would worsen with stress (Tr. 242). Plaintiff alleged that the seizures were always present but had gotten worse since September 2004 (Tr. 242). As a result, she stated she was uncomfortable in public and preferred to confine herself to her bedroom (Tr. 242). Dr. Pineda initially diagnosed Plaintiff with undifferentiated schizophrenia (Tr. 242). After a mental status examination later that month, Dr. Pineda noted that Plaintiff was depressed and anxious with restricted effort, experienced auditory hallucinations, and showed poor insight (Tr. 241). He diagnosed Plaintiff with depression and recommended she receive counseling and be examined by a neurologist (Tr. 241). A month later, Plaintiff complained of difficulty sleeping and received modified medications (Tr. 238).

In April 2005, Dr. Horton examined Plaintiff, noting that she was sleeping better but not well and continued to have many physical symptoms, including hallucinations (Tr. 236). Dr. Horton also opined that Plaintiff held in a lot of anger related to her losses, including financial problems (Tr. 236). Plaintiff was seen at that time by Dr. Robert E. Cranston, a neurologist at Carle Clinic Association, who took a family history and requested past medical records before issuing a diagnosis (Tr. 220-23).

Dr. Cranston partially reviewed the medical records on August 2, 2005, but hesitated to make a diagnosis without all available medical records since he felt it was "very important to nail down this diagnosis" because if a proper determination regarding whether Plaintiff suffered from epileptic or non-epileptic seizures was not made, the physicians "may well be totally missing the boat." (Tr. 218). Accordingly, he requested additional records (Tr. 219). In late August 2005,

---

[17] ENT stands for ears, nose, and throat. Stedman's Medical Dictionary 645 (28th ed. 2006).

Dr. Cranston received the requested records and, based primarily on the tests done by Dr. Rosenfeld in 1993, diagnosed Plaintiff with non-epileptic seizure events, which was likely a result of conversion disorder[18] (Tr. 217). Dr. Cranston recommended additional work be done with Dr. Pineda as Plaintiff appeared to show some improvement with him (Tr. 217).

Plaintiff saw Dr. Horton in late October 2005, and complained of continued depression (Tr. 231). Dr. Horton noted that Plaintiff's diaries indicated some improvement in her mood, but that Plaintiff did not perceive the improvement (Tr. 231). In a January 2006 visit to Dr. Horton, Plaintiff complained of trouble sleeping, but was referred to Dr. Pineda. She saw Dr. Pineda in late January and April 2006, but her sleep problems did not appear to respond to changes in her medication (Tr. 226-29). Plaintiff was further evaluated on July 19, 2006, by Dr. Horton, who did not find improvement with Plaintiff's depression, but did hear less from Plaintiff about seizures and hearing voices (Tr. 225). Dr. Horton noted that Plaintiff remained dependant on her husband and showed no motivation to change (Tr. 225).

## II. CONCLUSIONS OF LAW

### A. Legal Background

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive. . . ."); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See also White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (a reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts,

---

[18] Conversion disorder, like somatization disorder, is characterized by an unconscious conflict or repressed thought expressed symbolically. Stedman's Medical Dictionary 438 (28th ed. 2006).

reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. Golembiewski, 32 F. 3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability. 20 C.F.R. § 416.920. The ALJ must first consider whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 416.920(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimant's impairment is not severe, then the process is over, and the claimant is considered not disabled. If the finding is severe, however, the ALJ must proceed to step three.

At step three, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 416.920(d). If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. Id. However, if the impairment does not so limit the claimant's remaining capabilities, in step four the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. 20 C.F.R. § 416.920(e). If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. § 416.920(f). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner, at step five, to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g). If either Plaintiff is determined not capable to perform other work or such work does not exist in the national economy, the ALJ will enter a finding that Plaintiff is disabled.

**B.      The ALJ's decision**

The ALJ began by determining that Plaintiff satisfied the first two steps required to establish she was disabled within the meaning of the Social Security Act. Specifically, the ALJ found that (1) Plaintiff had not engaged in a substantial gainful activity since the alleged onset of disability, and (2) Plaintiff's seizure activity, obesity, and depression were considered "severe" within the requirements of 20 C.F.R §§ 404.1520(c) and 416.920(c).

In considering the third step, the ALJ found that these impairments did not meet or medically equal a listed impairment in Appendix 1, Subpart P, Regulation No. 4. At step four, the ALJ determined that Plaintiff had no past relevant work. Finally, the ALJ considered step five, where he found that Plaintiff could perform a significant number of jobs in the

national/regional economy. After considering each of these steps, the ALJ determined that Plaintiff was not disabled.

## C. Plaintiff's Claims of Error

Plaintiff argues four reasons why the ALJ's decision should be set aside. Plaintiff asserts that the ALJ (1) failed to articulate an assessment of all the evidence on record; (2) failed to properly weigh the medical determinations made by the treating physician; (3) failed to consider whether the Plaintiff's seizure condition was medically equal to the relevant epilepsy listing; and (4) improperly weighed Plaintiff's seizure condition in determining that Plaintiff could perform competitive employment. As the first claim of error, regarding assessment of evidence on record, relates primarily to the Plaintiff's third claim of error, the consideration of Plaintiff's seizure disorder, it will be evaluated under the seizure condition heading.

### (1) Plaintiff's Treating Physician

Plaintiff argues that the ALJ improperly disregarded the medical opinions of Dr. Pineda when making his findings. The ALJ considered that Dr. Pineda found that Plaintiff's depressive symptoms resulted in major impairment in several areas such as work, family relations, judgment, thinking, and mood (Tr. 17). The ALJ also noted that Dr. Pineda found Plaintiff had auditory hallucinations, insomnia, anxiety, fearfulness, and problems with impulse control (Tr. 17). Finally, the ALJ acknowledged that Dr. Pineda noted that Plaintiff's seizure symptoms worsened with stress (Tr. 17). However, the ALJ then stated that he gave "significant weight to Dr. Pineda's opinion" but also noted that "the claimant's condition is influenced by the level of stress she experiences at any given point in time." (Tr. 17). The ALJ then stated, "Thus, the undersigned finds that overall, the claimant is not as severely limited as indicated by Dr. Pineda, based on her testimony about her ability to perform activities of daily living and her improvement with mental health treatment." (Tr. 17).

Plaintiff argues that this determination is not supported by substantial evidence and argues that the effect of stress on her condition does not improve her employment prospects, but worsens them, and that her ability to perform daily activities does not substantially establish employability.  In this instance, "if…the ALJ finds that the treating physician's evidence is not credible, he is not required to give it controlling weight." Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982).  But an ALJ must support a decision that the treating physician is not credible with substantial evidence in the record. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dixon, 270 F. 3d at 1176.  Although an ALJ must "articulate, at some minimum level, his analysis of the evidence he is not required to address every piece of evidence or testimony." Id.  Further, while an ALJ may not disregard entire lines of evidence that are contrary to his findings, he need not provide a complete written evaluation of every piece of testimony and evidence in the record. Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999).

The ALJ appears to recognize that Dr. Pineda's opinions, as the treating physician, were the most reliable medical evidence available.  In his evaluation, the ALJ noted that he gave "significant weight to Dr. Pineda's opinions" (Tr. 17).  In fact, the ALJ gave "little weight" to the reports by the state agency medical experts who reviewed Plaintiff's medical records in October 2004, and January 2005, as part of the RFC assessment because "evidence received at the hearing level shows that the claimant is more limited than determined by the State agency consultants." (Tr. 17).  The ALJ also found the RFC assessment "did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments." (Tr. 17).  The ALJ gave Dr. Pineda, as treating physician, controlling weight over the state agency medical experts involved in determining the Plaintiff's RFC.  Therefore, it must be determined whether

the reasons stated by the ALJ for mitigating Dr. Pineda's conclusions are supported by substantial evidence.

The ALJ's first stated reason for mitigating Dr. Pineda's findings is that Plaintiff's condition was "influenced by the level of stress she experiences at any one time." (Tr. 17). The ALJ's report does not analyze or explain why the deterioration of Plaintiff's condition under stress would improve Plaintiff's chances of engaging in sedentary work. The Court's review of the record also fails to find any such supporting evidence. On the contrary, it seems likely that a workplace environment may introduce additional stressors which would likely increase the Plaintiff's stress level. In fact, several treating physician opinions suggest that Plaintiff's impairments are likely to be exacerbated when placed in a working environment. Dr. Pineda found that Plaintiff's condition resulted in "major impairments" in areas which included work (Tr. 17). Dr. Horton's 2004 diagnosis determined that Plaintiff remains dependant on her husband (Tr. 225). Dr. Horton also determined that Plaintiff "holds in a lot of anger related to her many losses and her current circumstances" which included "financial problems" and "dwells on things and does not let them go." (Tr. 236). These findings suggest that added stress in the workplace, particularly for a claimant with no past relevant work experience, undercuts the ALJ's decision to disregard Dr. Pineda's opinion regarding the severity of Plaintiff's limitations.

Plaintiff's testimony before the ALJ similarly indicates that being placed in a working environment may be additionally stressful for her. Plaintiff testified that she does not go anywhere out of the house without her husband (Tr. 262), and added that her depression makes her "really moody" so that she does not "want to be around other people" (Tr. 255). Plaintiff's transition from living at home with her husband to working somewhere else without him is more likely to increase Plaintiff's stress level than to decrease it.

Defendant's brief alleges instead that a limitation to unskilled work would reduce this stress. Regardless, there is no explanation by the ALJ, nor any medical analysis presented, which provides the requisite substantial evidence to suggest the "major impairments" cited by Dr. Pineda will be alleviated by limiting the Plaintiff to unskilled work.

The ALJ next cites the ability of the Plaintiff to perform daily activities as a factor which mitigates Dr. Pineda's conclusions. Under the ALJ examination, Plaintiff testified that she dresses herself, bathes herself, fixes simple meals, does the laundry, and does some additional housework, although she did not manage money, do yard work, or go shopping on her own (Tr. 258-59). The ALJ is allowed to consider a claimant's daily activities when determining the extent of an alleged disability. See Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). However, minimal daily activities "do not establish that a person is capable of engaging in substantial physical activity." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

While the claimant's ability to endure daily activities may be considered by the ALJ, the Court does not find that the ALJ's reasoning, which in effect ignores the treating physician's conclusions, is supported by substantial evidence. The ALJ does not explain how the performance of these specific daily activities suggests the capacity to perform sedentary work. The Seventh Circuit has noted that "the pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006). That would seem particularly true here, where medical evidence acknowledges that Plaintiff has a difficult time around other people without the presence of her husband.

Moreover, there is little consensus, even within the Seventh Circuit, on what extent and range of daily activities justify finding that a claimant can work. Compare Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) (where a claimant's ability to cook, clean, shop, and care for

children, with help, did not demonstrate the ability to work in the labor market), and <u>Carradine v.</u> <u>Barnhart</u>, 360 F.3d 751, 756 (7th Cir. 2004) (evidence that a claimant could drive, shop, and do housework did not evince an ability to maintain concentration and effort over a full work week) with <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 505 (7th Cir. 2004) (where activities by the claimant including household chores and laundry contradicted a claim that he was disabled).  As such, while the Court recognizes the ALJ's right on consider Plaintiff's daily activities in making its ruling, conclusions based on those daily activities must be supported by substantial evidence. Here, it appears that the ALJ's failure to give Dr. Pineda's conclusions full weight because he found Plaintiff's ability to perform certain daily activities means that his decision is not supported by substantial evidence.  It is also noteworthy that in the ALJ's analysis at step two, he found Plaintiff's stated impairments "could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are somewhat credible." (Tr. 16).  This too undercuts the ALJ's failure to give Dr. Pineda's opinion full weight.

> **(2)** **Plaintiff's Seizure Condition**

> **(a)** **Listing 11.02 and 11.03**

Plaintiff argues that the ALJ's erred in his determination at step three of the inquiry by failing to adequately address whether Plaintiff's seizure condition is medically equivalent to the Epilepsy listings of 11.02 and 11.03. 20 C.F.R. § 404, Subpart P, Appendix 1.  The listing states as follows:

> 11.02  Epilepsy – convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:

>> A. Daytime episodes (loss of consciousness and convulsive seizures) or

> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.
>
> 11.03  Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Plaintiff concedes that her seizures are non-epileptic in nature, but contends that the ALJ failed to evaluate the frequency, severity, and effects of her seizures to determine whether they were medically equivalent to Listing 11.02 and 11.03.

If an impairment is not explicitly matched in a corresponding listing, the ALJ is required to "compare [] findings with those for closely analogous listed impairments."  20 C.F.R. § 404.1526(b)(2).  If it is determined that "the findings related to [the] impairment(s) are at least of medical significance to those of a listed impairment," the impairment "is medically equivalent to that listing." 20 C.F.R. § 404.1526(b)(2).  "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).

An ALJ's credibility determinations are afforded special deference upon review, Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004), and a decision will be upheld "so long as the evidence supports it and the ALJ explains his analysis with 'enough detail and clarity to permit meaningful appellate review.'" Eichstadt v. Astrue, No. 06-4295, 2008 WL 2764636 at *1 (7th Cir. July 17, 2008) (internal citation omitted).  This means that the reasons given by an ALJ for his decision must "build an accurate and logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).  An ALJ's decision which lacks evidentiary support or adequate discussion of the issues cannot stand. Armstrong v. Barnhart, 434 F.Supp.2d 543, 550 (N.D. Ill. 2006) (citing Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002)).

In this case, the ALJ determined that that while the Plaintiff's seizure disorder was found to be "severe" in the step-two analysis, when he stated that Plaintiff "does not meet the criteria of [Listing 11.02 and 11.03] as the claimant has been diagnosed with seizures that are non-epileptic" (Tr. 15). There was no further discussion on this point by the ALJ. The ALJ did not make any findings related to the frequency, severity, or effects of the seizures within the context of Listings 11.02 and 11.03. The ALJ's decision that the impairment does not meet or medically equal a listed impairment appears wholly determined by the fact that the seizures were non-epileptic.

This limited explanation is simply inadequate to determine whether claimant's impairment is medically equal to the noted listings. The plain language of 20 C.F.R. § 404.1526(b)(2) requires the ALJ to compare the "medical significance" of an impairment to all listed impairments to determine if they are medically equivalent. In contrast, the ALJ here appears to have merely determined that because the seizures were non-epileptic, no further analysis was necessary.

In Boiles v. Barnhart, 395 F.3d 421 (7th Cir. 2004), the Court considered an ALJ's decision to deny social security benefits based on his finding that the claimant's pseudoseizures did not meet the relevant epilepsy listing. The ALJ had found that the claimant's description of her impairment was not "totally credible," and that the frequency of the seizures was "open to question," citing the lack of physical EEG evidence of the seizure as the reasons for the decision. Id. at 424-25. Although the ALJ ultimately denied disability benefits, the claim was initially evaluated on the merits under Listing 11.02 and Listing 11.03 and not merely dismissed because it pertained to non-epileptic seizures. Id. at 427.

On appeal, the Seventh Circuit found the ALJ's analysis insufficient and remanded for further proceedings. Id. at 427. The Court held that there was no basis for finding that the lack of

EEG evidence could be a significant factor in support for the ALJ's decision since medical evidence and testimony had established that while pseudoseizures did not produce the physical evidence common with epileptic seizures, they were no less "real" than epileptic seizures. Id. at 425. The Court also stated that if an ALJ determined that a claim regarding the frequency of seizures was not entirely credible, it should determine whether a "more conservative estimate . . . still supports a level of frequency that is commensurate with [the relevant listing]." Id. at 426. Accordingly, the Court was troubled by the fact that the ALJ had not made any affirmative finding about the frequency of Boiles' seizures. Id. It noted that "whether Boiles's pseudoseizures are of equal medical significance to epilepsy will depend in part upon how frequently they occur; thus the record must be more developed on this point." Id.

The Seventh Circuit's decision in Boiles directly addresses the medical equivalency issues in the instant case. The ALJ appears to have made no attempt to compare the effects of Plaintiff's pseudoseizures to the epileptic listings to determine whether the two were "medically equivalent," a problem exacerbated by the lack of an affirmative finding of fact regarding the frequency, severity, and effects of the seizures. Where an ALJ's evaluation of a claimant's seizure condition on the basis that the ALJ doubted the claimant's testimony regarding the frequency of seizures but did not affirmatively determine how frequent he believes the seizures are occurring, it may be found unsupported by substantial evidence. Boiles, 395 F.3d at 427; Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004). The ALJ in this case has failed to adequately discuss its findings with the "detail and clarity" to facilitate appellate review. The ALJ's failure to consider Listing 11.02 and 11.03 for non-epileptic seizures means that remand is necessary.[19]

---

[19] Defendant's brief cites the Seventh Circuit decision Scheck v. Barnhart, 357 F.3d 697 (7th Cir. 2004) to suggest that the RFC assessment done by the state agency physicians is dispositive of

The ALJ's report also suggests that a lack of physical medical evidence for the seizures justifies its decision, but a review of the record demonstrates that several physicians found Plaintiff's seizures were psychological in nature, such that a medically determinable cause may not be identifiable. A claimant may be entitled to disability benefits even if no physical cause can be assigned to his or her impairment. See Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006). Statements about the intensity and persistence of symptoms should not be disregarded solely because they are not substantiated by objective medical evidence. Frobes v. Barnhart, 467 F.Supp.2d 808, 822 (N.D. Ill. 2006) (internal citation omitted).

The analysis by the ALJ to support his conclusion at step three of the analysis is not supported by substantial evidence and a remand is necessary to evaluate whether the medical evidence demonstrates an impairment equivalency under Listing 11.02 and 11.03.

### (b) Listing  12.04 and 12.07

While not addressed in the Plaintiff's brief, the Court believes it is important to note the possibility that the impairment, were it determined to be outside the requirements of Listing 11.02 and 11.03, may also be appropriately evaluated under the listings for psychological impairments, most notably Listing 12.04 and 12.07. In Boiles, the Court urged the ALJ, when performing its review via remand, to consider other listings not previously considered, as "pseudoseizures may be more analogous to an impairment described in a listing other than 11.02, such as one that describes a psychological impairment." Boiles, 395 F.3d at 427. In the case sub judice, whether the psychological impairment listings are applicable to Plaintiff's disability determination should be considered by the ALJ on remand.

---

the medical equivalency question and that the ALJ need not give the issue further consideration. This argument carries little weight where, as here, the ALJ specifically notes that the claimant is "more limited than determined by the State agency consultants" in light of the additional medical evidence available at the hearing level (Tr. 17).

The ALJ actually mentioned this possibility in its original step-two analysis of "severe impairments." The ALJ noted that the Plaintiff had a medically determinable mental impairment which was "severe" "based on the "Part B" criteria of the listings at 12.04 and 12.07" (Tr. 14). The ALJ determined that neither listing was sustainable because "[t]here was no episodes of decompensation, and therefore no evidence for the presence of the "Part C" criteria" (Tr. 14-15). The Court is troubled by the ALJ's justification for rejecting the 12.04 and 12.07 Listings.

Listing 12.04 relates to Affective Disorders "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ dismisses this listing because of the lack of decompensation as detailed in the "Part C" criteria. However, "Part C" criteria is not required for Listing 12.04. "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. § 404, Subpart P, Appendix 1 (emphasis added). The ALJ appears to concede that the Plaintiff met all other requirements for Listing 12.04 because his only stated justification for not considering the listing was the lack of "Part C" criteria. Having determined Plaintiff's impairments to be "severe," the ALJ should have stated whether or not the claim met the requirements of Listing 12.04.

Listing 12.07 relates to Somatoform Disorders characterized by "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ similarly dismisses this listing because of the lack of decompensation as detailed in the "Part C" criteria. But Listing 12.07 does not list any "Part C" criteria nor require that any "Part C" criteria be met. While decompensation is mentioned as one possible aspect of "Part B" analysis, it is one of four possible symptoms, of

which the claimant need only suffer from two.[20]  The ALJ appears to concede that Plaintiff met

all other requirements for Listing 12.07 by its determination that Plaintiff's impairments were

"severe."  Yet ALJ should have explained why Plaintiff did or did not meet the requirements of

Listing 12.07.  The ALJ's decision here appears particularly unsupported since the ALJ

dismissed the Epilepsy listings because the seizures were diagnosed as "non-epileptic episodes

and conversion disorder," and yet failed to consider a listing that directly addressed physical

symptoms without a demonstrable physiological cause.  If, under step-three analysis, a claimant

is found to have an impairment that meets or medically equals a listing, the claimant is disabled

and any determinations in relation to steps four and five are rendered moot.

 For these reasons, this case must be remanded so that a finding can be made regarding

whether Plaintiff's seizure condition meets the requirements of Listing 12.04 and 12.07 at step

three of the disability determination.

### (3) Plaintiff's Future Employment

 Plaintiff argues that the ALJ's determination she could perform work that exists in the

national economy is not supported by substantial evidence.  Specifically, Plaintiff claims that the

medical records and testimony of the vocational expert in response to hypothetical questions

during the hearing establish that her seizure condition would prevent the reliability and

productivity required for competitive employment.

 Hypothetical questions posed to the vocation expert must include all limitations

supported by medical evidence in the record. <u>Steele v. Barnhart</u>, 290 F.3d 936, 942 (7th Cir.

2002); <u>Coleman v. Astrue</u>, 269 Fed.Appx. 596, 600 (7th Cir. 2008).  If an ALJ finds an

---

[20] Other effects which fulfill "Part B" analysis are "marked restriction of activities of daily living", "marked difficulties in maintaining social functioning", and "marked difficulties in maintaining concentration, persistence, or pace."  20 C.F.R. § 404, Subpart P, Appendix 1.

impairment is present, but is of questionable severity, the hypothetical questions presented to a testifying vocational expert must reflect at least some moderate level of impairment. See Hofslein v. Barnhart, 172 Fed.Appx. 116, 120 (7th Cir. 2006) (where questions to a vocation expert relating to a "moderate" mental impairment were still required to reflect that moderate level of impairment).

In order to make its determination regarding employment, a vocational expert (the "VE"), was called in to evaluate the Plaintiff's possibilities for future employment. Under examination from the ALJ, the VE considered a hypothetical person who could lift ten pounds, sit for six hours in an eight-hour workday, with physical limitations relating to heights, ladders, and machinery, and mental limitations allowing for only simple one or two-step tasks with "no decision making required, no changes in work setting, no production rate pace work, but rather goal oriented work and that person can have occasional contact with the public, coworkers, and supervisors" (Tr. 269-70). The VE determined such a person would be eligible to work 10,000 jobs in the regional area, including estimates of 800 system surveillance monitors, 1,200 inspectors, and 1,400 miscellaneous assembler positions (Tr. 270). The VE was then asked what effect the Plaintiff's seizure condition, if "claimant's testimony was found fully credible and generally consistent with medical evidence," would have on those employment prospects (Tr. 270). The VE opined that the seizure condition would preclude the Plaintiff from any work whatsoever (Tr. 270-71).

The ALJ appears to have made its determination based on a profile that included some of the mental limitations noted on the record, but without any consideration for her seizure disorder. This may stem from the ALJ's finding that the allegations concerning the frequency, severity, and effects of the seizures were only "somewhat credible" (Tr. 16). The ALJ stated he found the "claimant's medically determinable impairments could reasonably be expected to produce the

alleged symptoms," and that Plaintiff's seizure allegations were "somewhat credible." (Tr. 14).

Yet it is difficult to fully evaluate the ALJ's decision, however, when it fails to include a

determination as to what aspects of the condition are credible and which are not, or findings

related to frequency, severity, and effects of the seizures. Without such a finding, the ALJ's

determination at step five is not supported by substantial evidence.

An ALJ considering VE testimony may not completely ignore the existence of an

impairment that it already acknowledges is, even to a questionable degree, present. The VE

testified that seizures such that the Plaintiff described would preclude her from getting or

keeping employment. While an ALJ in doubt as to the severity of an impairment is not required

to give it full weight in its hypothetical questions to the VE, hypothetical questions should reflect

the claimant's impairments to the extent they are supported by medical evidence in the record.

Cass v. Shalala, 8 F.3d 552, 555-56 (7th Cir. 1993). "An ALJ may not simply select and discuss

only that evidence which favors his ultimate conclusion." Smith v. Apfel, 231 F.3d 433, 438 (7th

Cir. 2000). Therefore, an ALJ's complete disregard of an impairment which he has found to be

"somewhat credible," particularly when a VE's response on record indicates its consideration

may completely preclude employment, precludes by this Court that the ALJ's conclusion that

Plaintiff can perform work found in the national economy is supported by substantial evidence.

Remand is necessary so that, if this case proceeds to step five of the analysis, a finding can be

made regarding whether the presence of Plaintiff's recognized impairments have a preclusive

effect on her ability to work in the national economy.

### CONCLUSION

For the above reasons, it is **RECOMMENDED** that Plaintiff's petition be **GRANTED**,

that the case be **REMANDED** to the Social Security Administration for further proceedings

consistent with this Report and Recommendation, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1 (b), the parties shall have ten (10) days after service of this recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: September 2, 2008**

s/ *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**